UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| REBECCA GYSAN, individually and as executor of the estate of SHANE CATALINE, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 16-cv-8254 |
| v. | ) ) | Hon. Jorge L. Alonso |
| STEVEN FRANCISKO, and MARC MILLER, as director of the ILLINOIS DEPARTMENT OF NATURAL RESOURCES, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

After her son was shot and killed during an attempt to flee a traffic stop, plaintiff Rebecca Gysan filed an eleven-count first amended complaint. Ten counts remain against defendants Steven Francisko ("Francisko") and Marc Miller, in his official capacity as Director of the Illinois Department of Natural Resources.[1] The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court denies plaintiff's motion for summary judgment [54]. The Court grants in part and denies in part defendants' motion for summary judgment [45].

**I.  BACKGROUND**

The following facts are undisputed unless otherwise noted.[2]

---

[1] A claim against Marc Miller in his official capacity is really a claim against the Illinois Department of Natural Resources. *Belbachir v. County of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).
[2] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule

Plaintiff Rebecca Gysan ("Gysan") is the mother and executor for the estate of decedent Shane Cataline ("Cataline"). Cataline was a 30-year-old college graduate when, on the morning of November 21, 2013, he left his mother's home in Ohio in his Mercury minivan to drive to California for a job. At approximately 10:45 a.m. the following morning, defendant Francisko saw Cataline's minivan parked on the side of the road in western Illinois.

At the time he encountered Cataline's parked minivan, Francisko was on routine patrol for his job as a conservation police officer for the Illinois Department of Natural Resources. As a conservation police officer, Francisko had all of the powers (including arrest) possessed by police officers, except that he could exercise those powers in any county of the State. Prior to becoming a conservation police officer, Francisko had spent 10-12 weeks in basic training, which included training in the use of firearms and deadly force.

The morning of November 22, 2013 was the first day of deer-hunting season, and Francisko was conducting compliance checks on deer hunters in Whiteside County. Francisko was driving an F-250 pick-up truck with a light bar on top and state conservation police decals on the sides and tailgate of the truck. Francisko was wearing a uniform, which included a coat with a star on the front and department patches on the side. Francisko was also wearing a baseball cap with a star on the front. In addition, Francisko wore his duty belt, with his firearm, two magazines, a baton, a flashlight, handcuffs and a multi-tool.

---

56.1 strictly. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). The Court does not consider any facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed. The Court notes that it sustained defendants' hearsay objections to ¶ 38 of plaintiff's statement of facts [57] and to plaintiff's exhibit A, the autopsy report [53-1].

At about 10:45 a.m., Francisko spotted Cataline's van parked on the side of Burns Road, about one mile from the exit from I-88. Cataline sat in the driver's seat. Francisko noticed Cataline's out-of-state license plate and noticed individuals, across the road, exiting the woods with weapons. Francisko was concerned Cataline might be poaching deer. Francisko activated his emergency lights and stopped his truck behind Cataline's minivan on the side of the road. Francisko was stopping both to check on Cataline's welfare and to determine whether Cataline was poaching deer.

Francisko went to Cataline's window and was there for less than a minute. During that time, Francisko thought Cataline was acting strangely. Cataline moved his head from side to side and did not want to answer questions, although Cataline mentioned he was driving to California. Cataline provided his driver's license to Francisko.

Francisko went back to his truck to check for outstanding warrants on Cataline's license. About this time, Francisko, who had not called for back-up, noticed the marked squad car of an Illinois State Trooper pull up behind his vehicle. The vehicle was driven by Illinois State Trooper Luke Kuehl ("Kuehl"), who was wearing an Illinois State Police uniform and a body microphone. Kuehl's squad car was equipped with a dashboard camera.

At some point after Francisko took Cataline's driver's license but before Francisko returned to Cataline's window, Cataline telephoned 911. He told the operator his name and location. Cataline told the operator, "I am in a lot of trouble right now." Cataline also said, "I think I am going to be disappearing or something." Cataline hung up.

As Francisko reapproached Cataline's window, he heard Cataline say into a phone, "this isn't going to end well," and then saw him drop the phone. To Francisko, Cataline seemed nervous, and Francisko was worried he might be tired. Francisko twice asked Cataline for

3

permission to search Cataline's car, saying, "a lot of drugs come through here." Cataline declined. Francisko handed Cataline back his license and suggested that he check into a hotel to get some sleep. Francisko told Cataline he was free to go, and Cataline drove off. Francisko had not asked Cataline to step out of the car and had not conducted a field sobriety test. Kuehl had accompanied Francisko to Cataline's window, but he had not spoken.

In the meantime, the 911 operator who had spoken with Cataline telephoned the dispatcher, because she was concerned about Cataline. The 911 operator was informed that officers were already with Cataline.

After Cataline drove off, the dispatcher informed Francisko and Kuehl about the 911 call. Specifically, Kuehl and Francisko were told that Cataline had called 911, had been "cryptic" on the call, had said he "was in a lot of trouble" and that he "would be disappearing soon." (Thus, what Francisko and Kuehl were told is slightly different from what Cataline said during the 911 call.) Defendants put forth disputed evidence that, at that point, they thought they should check on Cataline's welfare. Francisko also suspected that Cataline might be transporting drugs.

Francisko drove to the interstate and headed eastbound. Kuehl followed in his squad car. Eventually, they caught up to Cataline on the interstate. As they were following Cataline's vehicle, they were in contact with a dispatcher. Francisko mentioned that he had tried to obtain consent for a search of Cataline's vehicle but had been denied. Francisko added that it was "very possible he was transporting something." Francisko said he was going to follow Cataline to "look for some probable cause." Francisko, who had never been involved with a drug stop, asked the dispatcher if a K-9 unit were available.

At some point while Francisko and Kuehl were driving behind him, Cataline telephoned his mother, who thought he sounded scared. Cataline told his mother he was being followed by

4

two people, at least one of whom was an officer. Cataline told his mother not to trust cops and to "find a safe place." Cataline hung up. Around the same time, the dispatcher attempted to reach Cataline by telephone, but the call went straight to voicemail. The dispatcher informed Kuehl and Francisko that she had not reached Cataline.

In the meantime, Kuehl had taken the lead and was directly behind Cataline's vehicle, with Francisko following Kuehl. Defendants have put forth disputed evidence that Kuehl received word from his supervisor that, based on the 911 call, Kuehl could pull over Cataline to check on his welfare. It is undisputed that the dispatcher told Kuehl they could do a wellness check on Cataline. Defendants put forth disputed evidence that Kuehl saw Cataline cross his right tires over the white line (which the parties refer to as the fog line) at the right side of the interstate.

Kuehl put on his emergency lights and initiated a stop of Cataline. When Cataline pulled over, Kuehl parked his vehicle behind Cataline. Francisko parked his vehicle in front of Cataline's minivan. Within 40 seconds after Cataline stopped his vehicle, Kuehl and Francisko were at his window.

Cataline did not turn off his vehicle or shift it out of drive. Cataline stared straight ahead with a "thousand-mile stare." One of the officers told Cataline they wanted to speak to him about the 911 call he made. They asked him to turn off the car and hand over the keys. Cataline did not respond or make eye contact. The officers again asked Cataline to turn off the car and hand over the keys.

About thirty seconds after the officers first approached his window, when the officers asked Cataline a final time to put the vehicle in park and hand over the keys, Cataline reversed his car quickly, put it back in drive, turned toward the left and made a U-turn such that he was

5

heading westbound in the eastbound lanes of I-88. As Cataline started moving his vehicle, Francisko had to move to avoid being hit. Francisko also started waiving his arms to alert oncoming traffic, including a semi-truck he could see. As Cataline started moving his vehicle, Kuehl headed toward his squad car, opened the door and attempted to get in.

Before Cataline got far heading westbound in the eastbound lanes, Cataline turned his car left and smashed (t-bone style) into Kuehl's squad car. This was approximately eight seconds after Cataline started moving his vehicle. It did not appear to Francisko that Cataline had lost control of his vehicle. It is undisputed that after the impact, Cataline's car continued to accelerate, partially pushing Kuehl's squad car off the road. The vehicles came together such that they were nearly parallel to each other. The impact caused the driver's side door on Kuehl's squad car to fold backwards.

The parties dispute Kuehl's location at the time Cataline's minivan ran into Kuehl's squad car. Plaintiff put forth evidence that a truck driver testified that, before impact, Kuehl had moved behind his vehicle. Defendants put forth evidence that, at the point of impact, Kuehl was standing inside the open driver's side door of his squad car. Defendants put forth disputed evidence that after Cataline's vehicle hit Kuehl's squad car, Kuehl's hips were pinned between the two vehicles.

It is undisputed that, after impact, Cataline's engine continued to rev and that his tires continued to spin. It is undisputed that Cataline did not attempt to exit his vehicle and that it sounded to Francisko like Cataline had his gas pedal to the floor. Defendants put forth disputed evidence that Francisko heard Kuehl yelling and that Francisko believed Kuehl was being killed. Defendants put forth disputed evidence that Kuehl, himself, felt like he was being killed.

6

It is undisputed that Francisko jumped on the hood of Kuehl's squad car and discharged his weapon five times into Cataline's driver's-side window. Only six seconds had passed between the time Cataline's vehicle first hit Kuehl's squad car and the time Francisko fired his first shot. Two seconds elapsed between the first and fifth shots. Defendants put forth disputed evidence that the reason Francisko jumped on the hood of Kuehl's squad car was that he did not want Kuehl to be dragged (by the cars) into the line of fire.

Cataline died at the scene.

## II. STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III. DISCUSSION

### A. Plaintiff's excessive force claim

In Count II, plaintiff seeks relief under §1983 for defendant Francisko's alleged violation of Cataline's Fourth Amendment right to be free from excessive force. Defendant Francisko moves for summary judgment on Count II.

A "claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). Objective reasonableness is a pure question of law. *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007) ("the reasonableness of [defendant's] actions . . . is a pure question of law."); *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012) ("Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide. We defer to a jury's determination of what occurred during an arrest or whose testimony is credible. But . . . we must independently review the jury's interpretation of what is reasonable under the Fourth Amendment.").

Determining objective reasonableness requires balancing the government interests with the individual's Fourth Amendment interests and "requires analyzing the totality of the circumstances." *Plumhoff*, 572 U.S. at 774. With respect to balancing the interests, the Supreme Court has advised:

> So how does a court go about weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person? We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between the two evils that [defendant] confronted.

*Scott v. Harris*, 550 U.S. 372, 384 & 386 (2007) ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate

the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."). In considering objective reasonableness:

> [w]e analyze this question from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' We thus 'allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'

*Plumhoff*, 572 U.S. at 775 (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

### *Qualified immunity*

Defendant Francisko argues that he is entitled to summary judgment on his qualified immunity defense to Count II. Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, __ U.S. __, 136 S.Ct. 305, 308 (2015) (reversing denial of qualified immunity in an excessive force case).

When considering whether a constitutional right is clearly established, a court must not define the right at a high level of generality; rather "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, __ U.S. __, 139 S.Ct. 500, 503 (2019) (reversing and remanding denial of qualified immunity in excessive force case). The Supreme Court has explained:

> [I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in defendant's shoes would have understood that he was violating it.

*Kisela v. Hughes*, __ U.S. __, 138 S.Ct. 1148, 1153 (2018). The Supreme Court has also provided examples of the correct inquiry. As the Supreme Court explained in *Mullenix* about the question in another case,

9

> [t]he correct inquiry, the Court explained, was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [she] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight.'

*Mullenix*, 136 S.Ct. at 309 (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)). In *Mullenix*, the question was whether "existing precedent placed [beyond debate] the conclusion that [the officer] acted unreasonably" when he shot "a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular traffic, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer." *Mullenix*, 136 S.Ct. at 309.

The Supreme Court has emphasized:

> Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.

*Kisela v. Hughes*, __ U.S. __, 138 S.Ct. 1148, 1153 (2018) (reversing denial of qualified immunity to officer who, concerned for the safety of a person nearby, shot a woman who was holding a knife she had just hacked into a tree and "whose behavior was erratic enough to cause a concerned bystander to call 911 and . . . flag down [the officer]") (quoting *Mullenix*, 136 S.Ct. at 309). In *Emmons*, the Supreme Court again noted "'[W]e have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.'" *Emmons*, 139 S.Ct. at 504 (citation omitted).

It is the plaintiff who must show that a right is clearly established, and, to do so, the "plaintiff must demonstrate that existing caselaw at the time of the events in question 'placed the statutory or constitutional question beyond debate.'" *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741(2011)); *Kernats v. O'Sullivan*,

35 F.3d 1171, 1176 (7th Cir. 1994) ("The plaintiff bears the burden of establishing the existence of a clearly established constitutional right.").

With this legal backdrop in mind, the Court considers whether defendant is entitled to judgment as a matter of law on his qualified immunity defense. The Court first notes that, if a trier of fact concluded that, when Cataline crashed his car into Kuehl's squad car, Kuehl was pinned between the vehicles, then it would be clear, as a matter of law, that Francisko would be entitled to judgment as a matter of law on his qualified immunity affirmative defense (and, for that matter, that the force he used was objectively reasonable). At the time Francisko fired, there was no precedent which said it was excessive force for an officer to shoot a driver who was injuring a police officer with his car and continuing to rev the engine.

That, however, is not the question for this Court. The parties dispute whether Kuehl was actually pinned between the cars, and those issues of fact prevent the Court from ruling on the qualified immunity issue as though Kuehl were pinned between the cars. *See Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018) ("The existence of substantial factual disputes about the circumstances and timing surrounding [defendant's] decision to shoot [plaintiff] precludes a ruling on qualified immunity at this point."[3] The question for this Court is whether "[t]aken in the light most favorable to party asserting the injury, do the facts . . . show the officer's conduct violated a constitutional right?" *Brousseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 197 (2001)).

---

[3] In *Strand*, the Seventh Circuit explained that, where issues of fact preclude summary judgment on qualified immunity, a district court may use special interrogatories to resolve the issues of fact and, if appropriate, grant qualified immunity at trial. *Strand*, 910 F.3d at 918-19 (citing *Warlick v. Cross*, 969 F.3d 303, 305 (7th Cir. 1992) ("When the issue of qualified immunity remains unresolved at the time of trial, as was the case here, the district court may properly use special interrogatories to allow the jury to determine disputed issues of fact upon which the court can base its legal determination of qualified immunity.")).

11

So the question is whether plaintiff (who, as noted above, has the burden) has pointed out any existing caselaw that shows Francisko violated a clearly-established constitutional right when he shot a person who had called 911 earlier to say he "would be disappearing soon" and had, less than fifteen seconds earlier, fled a road-side stop by turning the wrong direction into oncoming traffic on an interstate highway, smashed his car into a police vehicle and then continued to rev the engine such that the wheels on the person's vehicle were spinning. The Court concludes that plaintiff has not "identif[ied] a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *See Emmons*, 139 S.Ct. at 504.

Plaintiff's response to the qualified immunity question is three sentences long and paints the constitutional issue at a very high level of generality by noting "[t]here are few constitutional rights more clearly established than the right to be free from excessive force." (Plaintiff's Resp. Brief/Docket 56 at 13). The case she cites for the proposition (*Sallenger v. Oakes*, 473 F.3d 731 (7th Cir. 2007)) is not a case involving a police shooting, so it sheds no light on the issue. The closest plaintiff comes to citing a case that sheds light on the reasonableness of the force used in this case is her citation to *Estate of Starks v. Enyart*, 5 F.3d 230 (1993).

In *Starks*, the Seventh Circuit considered the appeal of an officer who had been denied qualified immunity by the district court. There, Starks stole a taxicab and, when surrounded by police officers, attempted to escape by driving away. A police officer jumped in front of the moving car and shot Starks. *Starks*, 5 F.3d at 232. The Seventh Circuit, before dismissing the appeal for lack of jurisdiction, noted that Starks's "escape attempt did not involve menacing a police officer or civilian with a weapon—at least not until [the officer] stepped into the path of a car that had just begun to accelerate quickly." *Starks*, 5 F.3d at 233.

This case is different. First, Cataline had already menaced innocent bystanders and an officer (Francisko, who had to move out of the way) when Cataline fled the traffic stop by turning into oncoming traffic on the interstate and then slamming into Kuehl's squad car. Furthermore, Cataline's engine continued to rev and the wheels on the vehicle to spin, so a reasonable officer could have believed (as Francisko actually did) that Cataline had the pedal to the floor. A reasonable officer could believe Cataline was continuing to attempt to escape and that innocent bystanders (namely the individuals traveling down the interstate) could be injured. *See Plumhoff*, 572 U.S. at 776 ("[Plaintiff's] outrageously reckless driving posed a grave threat to public safety. And while it is true that [plaintiff's] car eventually collided with a police car and came temporarily to a near standstill, that did not end the chase. Less than three seconds later, [plaintiff] resumed maneuvering his car. Just before the shots were fired, when the front bumper of his car was flush with that of one of the police cruisers, [plaintiff] was obviously pushing down on the accelerator because the car's wheels were spinning, and then [plaintiff] threw the car in reverse 'in an attempt to escape.' . . . Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [plaintiff] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road. . . . [T]he police acted reasonably in using deadly force to end that risk."); *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705-06 (7th Cir. 2009) (even when the plaintiff had driven his vehicle onto the median, plaintiff continued to rev the engine and "attempted to regain traction" such that "a reasonable officer would have determined that, if he did reach the eastbound lanes, there was a significant possibility that [plaintiff] would have rammed one or more bystander's vehicles or caused an accident between bystanders' vehicles, posing a substantial risk of injury or loss of life.").

In short, plaintiff has not shown that existing precedent placed the specifically-defined constitutional issue beyond debate. She has not identified a case that squarely governs this one. Accordingly, defendant Francisko is entitled to judgment as a matter of law on his qualified immunity defense to Count II. The Court grants his motion for summary judgment as to Count II, and Count II is dismissed with prejudice.

### B. Plaintiff's claim for unreasonable seizure

In Count I, plaintiff asserts a claim for violation of Cataline's Fourth Amendment rights. The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. Amend IV. In her amended complaint, plaintiff alleges that Francisko violated Cataline's Fourth Amendment rights both: (1) when he initially walked up to Cataline's parked minivan; and (2) when he and Kuehl pulled over Cataline's vehicle when Cataline was driving on interstate 88.

*First stop*

Defendant first moves for summary judgment with respect to the first stop, which began when Francisko walked up to Cataline's minivan, which was parked on the side of the road. Defendant argues that this was not a seizure for purposes of the Fourth Amendment. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required."); *U.S. v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008) ("The police encounter in this case was not a seizure for Fourth Amendment purposes. Clements had voluntarily stopped his car; he did not stop because of the flashing police lights. Likewise, Clements was not seized when the officers approached his car. The officers approached the car to investigate why the car

had been parked and running on a public street for hours, a circumstance unusual enough to at least merit some investigation."). The Court agrees. Cataline was voluntarily parked, and Francisko did not seize Cataline when he walked up to his parked vehicle and asked a few questions, including to see Cataline's identification. Plaintiff has put forth no evidence that the interaction was not voluntary. In fact, Cataline declined Francisko's request to search the vehicle.

In any case, as defendants point out, plaintiff has not responded to this argument. Accordingly, the Court grants defendants' motion for summary judgment with respect to the first stop, and that portion of Count I is dismissed with prejudice. *See Burton v. Board of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) ("[I]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If the [nonmoving party] does not do so, and loses the motion, it cannot raise such reasons on appeal.") (citations omitted).

### *Second stop*

With respect to the second stop (when Kuehl turned on his emergency lights to pull over Cataline and Francisko parked in front of Cataline's stopped car), both sides move for summary judgment.

"The temporary detention of an individual during the stop of an automobile by the police, even if only for a short period of time and for a limited purpose, constitutes the seizure of a person within the meaning of [the Fourth Amendment]." *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 456 (7th Cir. 2010) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Thus, "an automobile stop is subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). Generally, "the decision

15

to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810 (citing *Prouse*, 440 U.S. at 659).

In this case, it is clear that plaintiff is not entitled to summary judgment on Count I with respect to the second stop. Defendants put forth evidence (albeit disputed) that Cataline crossed the fog line (the white line on the outside of the lane in which he was traveling) before Kuehl pulled him over. Crossing the fog line is a traffic violation in Illinois. *See United States v. Bentley*, 795 F.3d 630, 633-34 (7th Cir. 2015) (citing 625 ILCS 5/11-709(a)). Thus, defendants have put forth evidence from which a reasonable jury could find that probable cause supported the stop.

Despite this evidence, plaintiff argues that probable cause is not enough where an officer has a mixed motive. Plaintiff further argues Francisko had a mixed motive, because he suspected Cataline was transporting drugs. Francisko's motivations, however, are irrelevant. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 740 (2011) ("Efficient and evenhanded application of the law demands that we look to whether the arrest is objectively justified, rather than to the motive of the arresting officer."); *Whren*, 517 U.S. 806, 813 (1996) (rejecting "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved" and holding "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Plaintiff's motion for summary judgment as to Count I is denied.

Defendant Francisko, too, has moved for summary judgment on Count I. Defendant is entitled to summary judgment if the undisputed facts, in the light most favorable to the non-moving party, demonstrate that stopping Cataline's vehicle was objectively reasonable under the circumstances known to the officers at the time. "[T]he ultimate touchstone of the Fourth

Amendment is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). As the Court noted above, objective reasonableness is a question of law, not of fact. *Scott v. Harris*, 550 U.S. at 381 n. 8 (2007); *Phillips v. Community Ins. Corp.*, 678 F.3d at 520.

Here is what is undisputed about what the officers knew before they pulled over Cataline's vehicle. When Francisko first spoke with Cataline, before checking his license, Francisko perceived him as acting strangely. Cataline mentioned to Francisko that he was driving to California. As Francisko approached Cataline's window to return his driver's license, he heard Cataline say, "this isn't going to end well." To Francisko, Cataline seemed tired, and Francisko suggested he get a hotel to get some sleep. After Cataline drove off, Francisko learned from the dispatcher that Cataline had placed a "cryptic" 911 call, in which he said he "was in a lot of trouble" and "would be disappearing soon."

Based on these undisputed facts, the Court concludes it was objectively reasonable to pull over Cataline. A reasonable officer could conclude that Cataline was in actual trouble and needed help. Courts have approved searches and seizures as reasonable when undertaken to help and protect individuals. *See Brigham City*, 547 U.S. at 406 ("We think the officers' entry [into a home without a warrant] was plainly reasonable under the circumstances. . . . [T]he officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning. . . . The role of peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties."); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 561 & 566 (7th Cir. 2014) (warrantless entry into home was reasonable where homeowner's physician told police homeowner was suicidal); *United States v. Toussaint*, 838 F.3d 503, 508 (5th Cir. 2016) ("[I]n proper circumstances, the emergency-aid exception to the Fourth Amendment's warrant requirement can be used to justify a traffic stop.").

17

Plaintiff argues that a mixed motive bars a wellness check. Specifically, plaintiff argues that because Francisko suspected Cataline might be transporting drugs, he could not have been concerned about Cataline's welfare. The Supreme Court has rejected this argument. In *Brigham City*, the party argued the warrantless search was unreasonable, because "the officers were more interested in making arrests than quelling violence." *Brigham City*, 547 U.S. at 404. The Supreme Court rejected the argument, explaining:

> Our cases have repeatedly rejected this approach. An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' The officer's subjective motivation is irrelevant.

*Brigham City*, 547 U.S. at 404.

The Court concludes that the second stop was objectively reasonable. Accordingly, Francisko's motion for summary judgment is granted on Count I, which is dismissed with prejudice.[4]

### C. Plaintiff's remaining claims

Defendants argue that without an underlying violation of the constitution, plaintiff's other § 1983 claims (Count VIII for conspiracy to deprive constitutional rights and Count X for failure to intervene) necessarily fail. The Court agrees. In Count X, plaintiff alleges that Francisko failed to intervene to prevent Kuehl from initiating the second stop of Cataline. The Court, however, has already concluded that the stop was reasonable, so Francisko cannot be liable for

---

[4] To the extent plaintiff was attempting to prove a *Monell* claim in Counts I or II, the Court notes plaintiff has put forth no evidence to support such a claim. In any event, a municipality cannot be liable under *Monell* without an underlying constitutional violation. *Horton v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018).

failing to intervene. Francisko is granted summary judgment on Count X, and it is dismissed with prejudice.[5]

Likewise, Count VIII for conspiracy to deprive constitutional rights fails now that the Court has granted defendant summary judgment on the underlying constitutional claims. *Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016) ("Without a viable federal constitutional claim the conspiracy claim under § 1983 necessarily fails; there is no independent cause of action for § 1983 conspiracy."). Defendants' motion for summary judgment is granted as to Count VIII, and Count VIII is dismissed with prejudice.

Defendants also argue that plaintiff's remaining state-law claims (Count IV for false imprisonment, Count V for battery, Count VI for assault, Count VII for conspiracy, Count IX for intentional infliction of emotional distress and Count XI for indemnification) fail, because Francisko's actions were reasonable. Defendants have cited no caselaw to support the proposition, and the Court is not going to consider the merits of six state-law claims without defendants' so much as briefing the issues.

In any case, the Court has already resolved the federal claims before it. As is the general rule, the Court exercises its discretion and dismisses the state-law claims over which its jurisdiction is merely supplemental. *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ("The general rule, when the federal claims fall out before trial, is that the [district court] should relinquish jurisdiction over any supplemental . . . state law claims in order to minimize federal judicial intrusion into matters of purely state law."). Counts IV, V, VI, VII, IX and XI are dismissed without prejudice.

**IV.    CONCLUSION**

---

[5] The Court notes that plaintiff also asserted this claim against "unknown officers." Plaintiff, however, never named those officers, and the statute of limitations has run.

For all of these reasons, the Court denies plaintiff's motion for summary judgment [54]. The Court grants in part and denies in part Defendants' motion for summary judgment [45]. Defendants Miller and Francisko are granted summary judgment on Counts I and II. Defendant Francisko is granted summary judgment on Counts VIII and X. Counts I, II, VIII and X are dismissed with prejudice. The Court relinquishes jurisdiction over Counts IV, V, VI, VII, IX and XI, which are dismissed without prejudice.

SO ORDERED.                     ENTERED: February 14, 2019

_____
JORGE L. ALONSO
United States District Judge